Veronica May Clark v. Valletta Thank you. All right, Mr. Belforte, am I pronouncing that right? Yes, sir. All right. So you have reserved two minutes for rebuttal, so that gives you eight minutes to begin. You may proceed. Yes, Your Honor. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. I'm James Belforte. I'm an Assistant Attorney General for the State of Connecticut, and I represent the defendants in this case. At its heart, qualified immunity is about whether the official had fair notice that her conduct was unlawful in the situation that she confronted, and the Supreme Court has been clear about how we determine if that notice exists and how specific that notice must be. To be clearly established violation of the Constitution, there must be precedent articulating a rule, and the rule's contours must be so well defined that it is clear to any reasonable officer that his conduct was unlawful in the situation he confronted. As a practical matter, this means identifying case law from the Supreme Court or this circuit that demonstrates a violation in the particular circumstances confronted by the official, and the case must place the issue beyond debate. No such notice exists here because no such case exists here, and to the extent any cases have addressed the factual circumstances here, they have uniformly held for the officials in the position of these defendants. Can I talk a little bit about the factual circumstances here? I felt a little bit like I was reading about two different cases when I read the District Attorney's brief, because reading your brief, I understand the view of the case to be a question about whether the Constitution requires the provision of specific treatments, in particular vaginoplasty, but also maybe hormone treatment to somebody with gender dysphoria, and a lot of the case law discusses that in the context of circumstances where medical personnel have conducted an assessment and made a determination about what is or isn't available in a case, often on an individualized basis. If I understand the plaintiff's claim, it's not a claim as to these three defendants that we're talking about here, that some particular treatment was denied. It's that no meaningful treatment was offered for an extensive period. No referrals were made to somebody qualified to provide treatment. And then when a referral was made to an endocrinologist, no follow-up was conducted under circumstances in which that was a very damaging omission, and the follow-up was the responsibility of Dr. Valetta. Why is that not the framework we should be thinking about? I'm sorry for such a long time. No, no, Your Honor, I appreciate it. I'm trying to unpack it. I think the issue here, Your Honor, and as I would frame it, the way the Seventh Circuit framed it in Campbell, which is, is there a constitutional right for gender dysphoria treatment beyond hormone therapy? But I would add, in this context, talk therapy, social transitioning, and other mental health medication. But when you said beyond hormone therapy, there was a period between really brutal self injury associated with an established gender dysphoria diagnosis. I think there was well over a year before a referral for evaluation for hormone treatment took place. So it wasn't a question of whether or not they were entitled to some treatment. It was a question of whether or not some evaluation was warranted. So, Your Honor, at that point, I think there was an evaluation done because Ms. Clark had been diagnosed with gender dysphoria prior to the involvement of the defendants. But with regard to the period of time before the referral to the endocrinologist, that was during a period of time where Dr. Valetta was subject to a CMHC policy in which he had no ability to refer someone for hormones if they hadn't been receiving it in the community. That was like- Right, so if we concluded that that policy was a defense or provided qualified immunity to Dr. Valetta, that would be a sort of a separate argument from the question of whether the circumstances. I mean, that certainly is a different defense than you've got no constitutional expectation of any sort of follow up with respect to this very serious condition. Well, Your Honor, I think that saying any sort of follow up is kind of taking the facts in a way that's not supported by the joint stipulated facts in the 56A1, 56A2 statements. I mean, we see in the stipulated facts, it's admitted that every time APR and Kimball Goodman met with Ms. Clark, she provided supportive talk therapy, she prescribed Prozac. Same thing with the two times that Mr. Bush met with Ms. Clark, supportive talk therapy. Now, that's acknowledged by the plaintiff as treatment. It might not be the treatment that the plaintiff preferred. It might not be the treatment that, from the kind of person that she wanted it. And in this way, it's similar to Taylor. In Taylor, one of the issues was, it wasn't the existence of the risk. It wasn't the existence of the risk of suicide. It was, how do we respond to that risk? And in that case, there was suicide prevention protocols in place in the prison. But the argument was, at least in part, as this court recognized in Vega, it wasn't the right people doing them. It was just a nurse. It wasn't somebody qualified in mental health care. And I'm sorry if I'm missing this from the record. Does Kimball Goodman say, I provided supportive talk therapy with respect to the gender dysphoria? Or is the supportive talk therapy with respect to the depression that has flowed from this situation? I think in that way, it's similar to Lamb versus Norwood, the Tenth Circuit case, where the argument of the plaintiff was, well, you didn't really treat my dysphoria. You just treated the symptoms around the dysphoria. I think it's important to recognize that gender dysphoria is literally that, dysphoria. It's distress, right? It's a depressed mood, right? It's a mental health condition. So in this case, saying I provided supportive talk therapy, and I sought to address your dysphoric mood with Prozac, while also being aware that Ms. Clark was seeing APRN Reischel, who was another mental health treater, and addressing the gender dysphoria. I think that in that case, we're not talking about a lack of treatment. And that's the real key to this case, right? That's why what this court said in Vega is useful. Because we look at how the court interpreted Taylor and Labonte in the context of Vega. And in that case, it was a motion to dismiss, right? So we're bound by the allegations. And they said, you have to do something. You can't just ignore it entirely. And that's not what happened here. It is undisputed that treatment was provided. It is undisputed that hormones therapy was provided. And to the extent that there was a delay in getting the hormone therapy. One, Dr. Valle didn't have any ability to depart from that policy. And two, that's the exact factual circumstances that this court approached in Cuoco. The only case that this court has addressed dealing with anything even close to these circumstances, that was a case where the BOP had a policy in place that said if you are not receiving the treatment on the outside for gender dysphoria, which the court called transsexualism at the time, basically it's a freeze frame policy. In that case, this court found that the actions of the defendants were objectively reasonable. And three years later, in Obert versus Vargo, this court again described those actions as objectively reasonable. Now- In Cuoco, maybe I'm misremembering, I thought that at the end of the day, all the relevant defendants were, they had a different kind of immunity flowing from their public health. Well, it wasn't a qualified, they didn't- There were two kinds of immunity in that case, Your Honor. Some of the defendants, it was absolute immunity because they were federal employees. But for other employees, including, I believe it was a psychologist and a psychiatrist, the names escape me at the moment. They received qualified immunity, and the court ultimately found it was because their behavior under the circumstances was objectively reasonable. And that was how this court characterized it again three years later. So it's impossible to say that doctors or nurses, people in the defendant's positions, could have looked to this court's precedent at the time and said, I need to find a way to overcome this policy that I can't overcome, I have no ability to do so. And it's buttressed by the fact that you have the same situations, you have Koselec, you have Gibson, you have Campbell, all these other cases from the federal circuits, and you have nothing from the Supreme Court other than Taylor, which is the last time the Supreme Court addressed a mental health risk of harm in a medical deliberate indifference context. And in that case, identifying the risk itself in circuit court decisions, which is what the Third Circuit did, was found to be not enough. And what's more important about Taylor is that the actual, the exact formulation of the right issue that the district court did here, is what the district court did in Taylor. They said, you have a right to be treated for serious medical conditions. And that was the end of it. And even the Third Circuit rejected that as too narrow in a footnote.  I know your time's up, but I actually want to ask you about this. Your argument is that the right defined as deliberate indifference to serious medical need is too broad. I understand that argument. Their argument to you is the way you define the right is as a right to hormone therapy and vaginoplasty is far too narrow. Could you address that? Where's the right level of generality here? Yes, Your Honor. I think the right level of generality is how the court addressed it in Taylor itself, which is in Taylor, the way that the right was considered was within context, within reference to the risk, right? So they said, it's a right to adequate suicide protocols, suicide prevention protocols. And then the court rejected that any such right existed because there was no mention of such things in the Supreme Court. You could take Taylor and literally mad libs in the facts here, and it's the exact same result. I also think Campbell goes to that, because Campbell's a very instructive opinion, right? Because it comes out in 2019, which is after these defendants have gotten involved in the care in this case. And it ultimately says that defining the right as the plaintiff would have us define the right, and as the district court defined the right. It's far- It was a little bit narrower. It was just about the reassignment surgery there, right? It was, here you've got, as Judge Robinson was asking, a little bit broader kind of factual context. So Campbell, and the quote I have is, a constitutional right to gender dysphoria treatment beyond hormone therapy. And in this case, we actually do have beyond hormone therapy, because we have social transitioning, which was rejected as not necessary in Keonan by the 11th Circuit. We have supportive talk therapy, which again has been acknowledged, was provided. We have, Prozac was provided to treat the dysphoric mood. So the bottom line is when you look at this case, and when you look at the 56A1, 56A2, which are the stipulated facts, those are the undisputed facts. There's no argument that can be made that no treatment was provided. No, but you just shifted a little bit from the framing of, sorry for pointing at you. No, no, it's okay. From no constitutional right to treatment beyond hormone therapy. And I'm hung up on that as a formulation, because when I look at the claim, I see a period from August 2016 to September of 2017, where there's not even been a referral to an endocrinologist. So we're not in the beyond hormone therapy world, we're not even there. And then after the referral to the endocrinologist, I see another year and seven months during which, within the context of hormone therapy, there are very specific recommendations from the endocrinologist. And there's an utter failure to follow those recommendations by the treating provider, even while labs consistently validate that the initial dose is ineffective. So we're never even getting to the beyond hormone therapy world. Well, Your Honor, I think to the extent we're saying the, there's a couple things I want to break down there. Which is, so again, with regard to the first period of time, I think that that's basically controlled by Quoco. Because we have the same exact policy in which this court found it was objectively reasonable. Maybe that's changed in the 20 years since, but that was the law on the books at the time these people acted. With regard to the follow-up, there's a dispute of fact, frankly, as to whether or not Dr. Valetta was involved in scheduling follow-ups, that's something that's in the 56A1 of the plaintiff's- And I suppose that dispute of fact would mean no qualifying immunity at the summary judgment stage, because it's got to go forward. Well, no, Your Honor, well, at this point, the judgment has been entered. But a finding of liability has been entered against the defendant, so it's kind of an unusual factual predicate. Our position is that, on the undisputed facts here, you can't deprive these defendants of qualified immunity. My point is that to say, well, he had the responsibility and he had to follow up and he didn't do that, that's not an undisputed fact. So there can't be a deprivation of qualified immunity on that basis and a finding of liability on that basis. But I also think, with regard to the follow-up treatment, that's very similar to the court's decision in Hernandez v. Keene, which I believe was a 2003 decision, where the court ultimately found, you're talking about the right to have follow-up from what a outside provider says. That is more close to negligence medical malpractice. So to the extent there's an argument of, you have a clearly established right to effective follow-up treatment or something like that. We would say that, again, that's too broad because of the way the court handled it in Taylor. But even if that were the case, no such right exists because of cases like Hernandez v. Keene. All right. You reserve two minutes for rebuttal, Mr. Belforty. We'll now hear from Ms. Bildner. Thank you, Your Honor. Am I pronouncing that right?  Good morning, Your Honors, and assuming it's still morning, good morning, and may it please the court. I'm Alana Bildner. I represent Veronica Mae Clark, the appellee. Appellants ask you to reverse denial of qualified immunity unless every potential treatment for a medical condition is enshrined in case law. In other words, unless you have a Westlaw citation for every course of treatment, they win. But what they urge is exactly what Hope v. Pelzer forbids, say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. You should reject this formulation as you have previously for three reasons. First of all, this court has consistently rebuffed a condition-by-condition analysis when it comes to qualified immunity. And treatment-by-treatment analysis, which is what appellants urge, is a level of specificity above and beyond condition-by-condition. This court most recently rejected the idea of evaluating qualified immunity condition-by-condition in Collymore in 2023. And when it did so, it grounded its logic firmly in the 1994 case, Hathaway v. Hathaway. But it is, I mean, notice is the centerpiece of qualified immunity, right? So what is it that put these defendants on notice that what they were doing was not just wrong, but it was deliberate indifference that rose to an Eighth Amendment violation? This court has consistently found a right to adequate medical care and freedom from deliberate indifference to medical needs. And that's all it needs to find when it comes to clearly established. Because all of these medical providers were operating in a zone in which they said they were not treaters of gender dysphoria. They did not know- So your view is that adequate medical care is all you need to allege and that defeats qualified immunity every time? No, but the, it's about- So what sort of notice do the defendants have for adequate medical care? So the locus of the fight, Your Honor, is not in the law, but in the medical community. The medical providers must look, as the district court explained, to the medical community to figure out what is reasonable, individualized treatment for each medical condition. And that's exactly what the record has here. There are medical providers, in fact, both experts agreed that Ms. Clark's treatment was insufficient and inadequate. Of course, on denial of qualified immunity- So we're expecting defendants to sort of understand all that? That they should be versed in not just what is clearly a matter of law from the Supreme Court or the Second Circuit, but they should also know what is this current state of play in the medical community? Well, these three defendants were quite clear that they did not know what to do about gender dysphoria, and thus their responsibility was, of course, to refer Ms. Clark to someone who could. So what's your best case for that? That's what I'm trying to figure out. So yours, I mean, that's one of your arguments, and I get it. So what is the best case that you had an obligation, a clear obligation to refer to a specialist or to refer to someone who could- Yes, Judge Sullivan. So that's clearly in Hathaway v. Cochrane, right? So in that case, someone was persistently begging their general practitioner for assistance with a hip condition, a previous surgery had gone wrong, and the person was in chronic pain, much like Ms. Clark here was in chronic pain. And this court was very clear that in that case, a very substantial delay in arranging for the surgery to correct the condition raised a factual suspicion to survive summary judgment. But there there was a right to the surgery, right? No, well, first of all, Hathaway is not a qualified immunity case. It was a deliberate indifference case on summary judgment. But what the court said is important. The court said this general practitioner was the person most familiar with this man's condition. He was not a surgeon. Of course, he could not provide hip surgery himself. Nonetheless, he had to refer this person to someone who could. Just as in Hathaway v. Cochrane, here we have three defendant providers, because of the way that the Connecticut Department of Corrections sets up its medical system, who were the gatekeepers to her medical care. There's no dispute in the record. The district court found, of course, that whenever Ms. Clark needed any kind of medical care, she was routed to Dr. Valetta. Whenever she needed mental health care, she was routed to Ms. Kimball Goodman and Mr. Bush. Those were her only options. Thus, they controlled her access to further care. And what they did here, essentially, was really not lift a finger when it came to finding someone who could treat her gender dysphoria. That's the fair notice. Of course, if someone came to them with metastatic breast cancer, they wouldn't say, well, we're not oncologists, and thus we can do nothing. They would go ahead and refer. That also is the common denominator, Your Honor, in all of the gender dysphoria in prison cases that appellants cite. There was that threshold referral to medical providers, often a committee, multiple committees of people who were evaluating a particular patient and the viable options for that patient's care. And at the end of the day, the patient, the incarcerated person, disagreed. So I understand the rule that you're asking for. A culpable state of mind is what is required here can be satisfied by not referring to someone who's specialized in the specific condition. Is that what you're arguing? Well, there's plenty of evidence in the district court found a culpable state of mind based on the consistent pleas of Ms. Clark to these providers, the anguish that she surely felt, the fact that they were well aware she was- And that would have to mean, though, that the defendants subjectively knew that the talk therapy and the antidepressants were not enough, and the hormone therapy, I guess, after a certain point were not enough and still did not do anything. All of the defendants, the record is clear, Your Honor. All defendants said they did not know how to treat gender dysphoria. But that's different from knowing that what they were doing was not- Your Honor, all three of them, as the district court found, did have the subjective knowledge that what they were doing was not enough because they had a patient who was continuing to come to them in grave distress, saying she wanted to self-castrate again, she wanted to potentially commit suicide. But I think, more importantly, Your Honor, we are on a denial of qualified immunity here. We're on interlocutory appeal. And thus, this court is constrained by the facts as the district court found them. And the district court did find that no, and this is on page 48 of the district opinion, as a matter of fact, any reasonable provider would have known that the essentially wholly inadequate treatment would cause Ms. Clark to suffer. And the district court also found, as a matter of fact, that the defendant providers failed to treat Ms. Clark or provided inadequate care. Those are facts that this court has no ability to look further into in that they are binding on this court for purposes of this appeal. There's a lot of debate about sort of the level of generality of the rule that we're articulating. And I understand the critique that a condition-by-condition or a treatment-by-treatment framing is not the right framing. The critique of your position is, well, saying inadequate medical care is overly broad. And I'm wondering whether you would adopt this or endorse this as an alternate framing. In the face of knowledge of a serious ongoing medical condition causing ongoing pain and distress that's not effectively treated and treatable within the confines of the prison, there's an obligation to take reasonable steps, including external referral, to address the ongoing serious medical condition. Yes, Your Honor. I think that's a very reasonable way to characterize it. It also, I think, works very nicely with, again, the common denominator of the cases that found no deliberate indifference in general cases involving gender dysphoria in prison. Because, again, in all of those cases, that was the distinction, right? Right. There was a referral. There was an analysis. Exactly. And there might have been a debate about the treatment. Right. But if somebody was- Somebody was attuned to the fact that this person was suffering and needed treatment, and thus, again, the question is looking to the evidence from the medical community about how to treat this- This sounds like a negligent standard to me. No, Your Honor. This is not a negligent standard.  Because wholly inadequate medical care has always been found by this court to be deliberate indifference. But isn't the question whether this is wholly inadequate medical care? And you're saying that the way they would know it's wholly inadequate medical care is to become familiar with what is the state of the medical community. Again, for providers- I think breast cancer is a good example. For providers who are not oncologists, of course, they're not qualified to treat breast cancer. So then, of course, they would naturally go- And this is, in terms of fair notice, how medicine actually works, right? People go to a person with knowledge and competence in the area to understand what a reasonable course of treatment would be. Here, that never happened. We never reached the threshold evaluation of the menu of available options for treating this person's gender dysphoria because the gatekeepers to her care, who were these three providers, would never let her go to that level. But what is the rule for gatekeepers, I guess? You know, Judge Robinson has articulated one. But it does seem to me that it doesn't provide much guidance or notice to the gatekeepers, other than that they better err on the side of just making referrals. I certainly- it would have been a lot better if I think these providers would have erred on the side of making referrals. Again, fair notice is, if you are in a- I think it's incredibly fair notice. It's also how medicine works. If you, as a provider, are in a situation with a patient who you are not equipped to treat, then, of course, you have a responsibility to at least pick up the phone, write an email, you know, make sure that that person is moved along to someone who can treat them. And again, there was no dispute about this at- But I just- so again, they have a right, then, a person complaining of gender dysphoria has a right to a referral to whom? To someone who is competent or equipped to provide that kind of care. Gender dysphoria is no different than any other condition, right? Perhaps Ms. Kimball-Goodman could not treat diabetes. Again, she would have to refer- So anyone in mental distress, there is then an obligation to make a referral to a psychiatrist or to a specialist? For providers who are, again, undisputed on this record. These providers said, I do not treat gender dysphoria and I do not know how to treat it. In that case, yes, there is an obligation to refer that person to someone who can't. Otherwise, of course, the treatment would be wholly inadequate. These providers are not equipped to do it. I suppose maybe my framing was even too broad relative to what we need or what you need for the record in this case. Because the gatekeepers didn't- neither of the gatekeepers that I recall said, in my professional judgment, this was standard of care for gender dysphoria. Dr. Valetta said, there's a policy that would prohibit me from making the referral that might lead us to comply with standard of care. And Kimba Goodman said, I understood she was dealing with litigation to try to get the standard of care, and so I didn't see it as a place that I needed to be involved. But neither of them said I felt this was, in my professional- A, I'm qualified, and B, in my professional judgment, this is appropriate treatment for gender dysphoria. Of course. Of course, Your Honor. No one said that because they could not say that they were not- they had no idea how to treat gender dysphoria. But not only did they not- I'm trying to figure out why this isn't, in response to my colleague's question- Yes, Your Honor. A negligence case, if you don't- if you're not qualified to treat something, and you don't know you're not qualified to treat something, but you try to treat it, that might be negligence. If you know you're not qualified to treat something, and you don't do something anyway, that sounds more like the requisite state of mind. And so how do we distinguish those two scenarios here? What are the facts that we look at to tell us that they knew that what they were offering was inadequate? The fact that Ms. Clark was continuing over a period of, for Dr. Valetta, four years, to say that nothing is working, I don't feel any different, I want to self-castrate, I want to commit suicide. So being consistently presented, again, with Ms. Kimball-Gooden as well, consistent pleas for help, saying- It's interesting, the four-year period. Aren't there really two distinct periods? One period in which nothing's happened, no referral is happening, and then a period in which we now have a- The record doesn't really tell us whether the endocrinologist is qualified to treat gender dysphoria, but I'm going to assume that that's the case. And we have a qualified endocrinologist recommending a course of treatment, and then we have the gatekeeper declining to follow that course of treatment, even in the face of labs that tell us that that treatment isn't effective. Yes, yes, of course. I just want to emphasize, whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case. That's what this court said in Chansby-Armstrong in 1998. And I think the discussion we're having is a good illustration of that, because we have to look to Ms. Clark as a patient and what her needs were, how she should have been evaluated, what the menu of available options for treatment was, all of that. And we don't have that in the record because these three people did not refer her to the- So do we have to address whether there's a clearly established constitutional right to vaginoplasty in order to resolve your case? No, no. Do we have to address whether there's a clearly established constitutional right to hormone treatment? No, absolutely not, Your Honor, because that confuses the legal question of whether there's qualified immunity for the factual question of what were the viable treatments for someone's medical condition, right? That's, I think that is my essential point here, right? We are looking, this is a- So you have a right, so you're saying that you have a right to be referred to someone who will then refer treatments that there's no obligation to provide. That seems pretty strange. No, no, Your Honor, if I- So we don't have to decide that those treatments are appropriate. We just have to decide that you have a constitutional right to get to a specialist who might prescribe those things even though they're not required. Again, Your Honor, this court is not the kind of medical body making medical decisions about an individualized patient's appropriate treatment, right? We have to look to the factual record and the very comprehensive evidence from two medical experts who agreed in this case that Ms. Clark's treatment was insufficient. What I'm saying is enshrining rights treatment by treatment makes this court the doctor. And that's not, that's never how this court has operated. Instead, we define, does this person have a serious medical condition? Yes. Okay, then let's look to what steps were taken to address this condition. And for that, we need medical evidence. We need the record of this individual patient and the care that would alleviate her distress. That's where the locus of this fight is. It's in the factual record of what is appropriate care for this patient. Our case law seems to suggest that defendants need to be away or put on notice by court cases. You seem to be suggesting they should be put on notice by the state of the medical opinions. No. No, Your Honor. So why do we keep saying, I mean, our case law is fraught with suggestions that the Supreme Court and Circuit Court case law matters about the condition, right? Yes, Your Honor. Of course, Circuit case law matters for purposes of qualified immunity. But what I'm trying to distinguish is between the legal question of qualified immunity in clearly established law and the factual question of whether the measures taken to treat this patient were adequate. And did they evince deliberate indifference? Those are two different questions. And this court cannot say there's a right, again, metastatic breast cancer. There's a right to chemotherapy after radiation. But there's not a right to mastectomy. That's just, that's not how we talk about qualified immunity. We say there's a right to meaningful treatment. There's a right to treatment that uses medical judgment. There's a right to treatment that is not less efficacious than the treatment that would actually treat you. All of this is in this court's case law. And the district court's language here was the right to informed care. What does that mean? Is that the same thing you're talking about right now? The right to informed care, I think, is a good illustration of why Mr. Bush, for example, was not providing treatment for gender dysphoria. Even if he was providing treatment in the abstract, it was not gender dysphoria. He always provides for that as a constitutional right. The right to informed care, I think this court has, again, said that very clearly in Hathaway v. Coughlin. Hathaway is a good indicator of that. Brock v. Wright from 2003 is also a good indicator of that. Someone needed to see a dermatologist in that case and was prevented by gatekeepers from doing so. Chance v. Armstrong also, I think. Do you think the holding of those cases is that you have a constitutional right to informed care that will vary on the particulars of the malady, and that's enough to put defendants on notice? This seems like an over-reading of Hathaway, but maybe I'm missing something. Your Honor, I think I would take it a step back. There's a constitutional right to adequate care, to some kind of meaningful care for a medical condition. That's all this case is about. These defendant providers never reached that threshold because, again, they could not provide it but refused. But you keep suggesting that there's no need to answer the question of what is the adequate care. There's just a right, sort of a free-form right to do something. They didn't do something without... You're saying we don't have to decide what is the care. The district court has to decide that, Your Honor, respectfully. That's the district court that has to decide that based on the factual record, what was this person's condition, and medical evidence, evidence from the medical community about how we treat this condition today. The district court is not looking to case law from 20 years ago to see if there's a right to insulin provision, or there's a right to this particular kind of treatment for this particular condition. No, the district court is saying there's a right to meaningful care. What measures did these people take to vindicate that right? And were they reasonable? And were they done with knowledge of the risk? Yes or no? We typically look to say that at some point, we announce a case that says, yeah, insulin is a requirement, right? But medicine is a dynamic. That doesn't logically make sense. That's why this is not negligence. This is something that requires a much greater degree of notice and a much greater degree of mental state. I think that's overlooking, Your Honor, how medical providers actually act. They're not saying checklist of things that are in the law. They're saying, here's a patient presenting with these things. I know what is reasonable medical practice to treat this condition. Or if I don't know, here's this other person who does. And then we evaluate the measures they took based on that. We have to look to evidence from the medical community rather than kind of ossifying certain treatment decisions in the case law. In this case, if there had been a referral to a psychiatrist whose practice includes gender dysphoria, and the psychiatrist had said, I don't think transition-related treatment is indicated in this case for the following reasons, would that be at all the same case? Same deny, and let's say that the defendants then didn't make any referrals for a hormone or other things. Would that be at all the same case? No, that's not the same case. I mean, that's what happened in Campbell v. Collis, right? There was a referral to a committee of people who then went and got Cynthia Osborne, who at the time did not believe that surgery, for example, was medically necessary. She's since changed that opinion. If you look at Edmo, you can see that. And that's a different case, because we never got to that threshold determination by someone who at least was saying, I know what I'm talking about, and I think you don't need surgery. No. Well, it wasn't even, I know what I'm talking about, and I think you need surgery. Do we have anybody saying, I don't think you need the treatment? No, no, we do not. We don't even have that. We have other reasons why they weren't taking steps to make that treatment potentially available or evaluations, but we don't have either of them saying, I concluded in my medical judgment that this was appropriate treatment. Yes, that's correct. And we have two experts who said, agreed. This is not a battle of the experts, even. They agreed the treatment was insufficient. All right. Well, we got our money's worth. Thank you, Ms. Gilbert. Thank you, Your Honor. We'll now hear from Mr. Belforti for two minutes of rebuttal. Mr. Your Honor, a bunch to respond to there. I think when we're talking about cases like Hathaway and Brock, the important thing to remember about Hathaway is that was a case where there was a surgeon identified. The surgeon, the outside surgeon, had done the surgery. And the problem was there were broken pins in the guy's hip. The doctor knew about it, didn't tell the patient, ignored the complaints of pain. And then afterwards, it got the surgery done. Also, that was a Rule 50. So that's a situation where what the court was dealing with as a procedural posture was can a jury, have made a reasonable inference of subjective intent there? There was no finding of subjective intent there by the judge. I was taken aback by my friend's argument that the district court judge made findings of fact. The district court judge can't make findings of fact. That's the whole point of a summary judgment analysis. But I think the reason the plaintiff's argument is foreclosed, it's not just Taylor. I mean, Taylor, obviously, Supreme Court case, and the way they define the right there is important. But look at how the circuits define the rights in other cases like this, deliberate indifference medical cases. Bernier v. Allen in the DC Circuit. That was entitled to treatment with Harvoni within two months of the medical community deciding it was appropriate for lower risk patients like him to receive it. That's identifying not just the condition and not just the kind of treatment, but a specific pill. That's pretty specific. The 10th Circuit, we have Byrd versus Lampert rejects that formulation. Tolar v. Trout rejects the formulation. That's the 10th Circuit. The 11th Circuit, we have- Can I just remind for the time's up? Yes. Am I right in my little closing back and forth with your friend, am I right that neither of the gatekeeper defendants said, in my medical judgment, this was the appropriate treatment for gender dysphoria for this individual? I don't think so, Your Honor, respectfully. I think if you look at the 56A1, 56A2 and that's- Tell me where to look in that. Tell me where to find them saying, I didn't fail to do it because I was foreclosed for some reason. I failed to do it because I concluded it was the best appropriate medical treatment. Okay. I believe it's page 126 of the Joint Appendix, specifically paragraph 51. In APR Kimball Goodman's opinion, for most of the time she provided care, plaintiff was well adjusted, able to advocate for herself in her care, and generally had no acute mental health concerns. That's a finding. Now, maybe she was wrong. Maybe she made a mistake. But if you say, if it's undisputed that she did not draw the inference, how can it possibly be said that, well, you knew this was ineffective and you ignored it anyways? Frankly, that's not even a dispute of fact. Doesn't the same provider also say, I didn't provide treatment for gender dysphoria because I understood she was advocating for that on her own and was perfectly capable of doing that? I don't believe that's what she said. I think she said, I was aware that she was pursuing surgery via legal means. But that's different than saying I provided no treatment. Apera Kimmel Goodman provided treatment. I also think it's a bizarre distinction to say, well, she provided treatment in the form of supportive talk therapy for this but not that. Gender dysphoria, at the end of the day, is just distress because of incongruence between someone's felt gender and their biological sex. So at the end of the day, if you're saying, I'm treating your dysphoric mood, I'm giving you supportive talk therapy, I'm prescribing you Prozac, that's treatment. It might not be treatment by somebody who has specialized in gender dysphoria. It might not be surgery. But that's treatment. And there's no case, no case from the circuits or from the Supreme Court or from this court that says that that's inadequate. In fact, Koselec and Campbell and Lamb and all these other cases from the circuit say that is enough. So if you have a treatment that presents with sort of, I mean, this mental physical divide is sort of a myth, right, when a lot of conditions bridge both, right? So if you have somebody with schizophrenia, it presents as a psychological psychiatric condition, but the treatments are medical. They're medicinal. They're physical. And in part, there may be other treatments. And so if you had a provider with somebody known to have a schizophrenia diagnosis, and you had a mental health provider who made no referral, let's call it a social worker or somebody who's not able to prescribe themselves, who made no effort to secure an evaluation for possible prescription therapy, knowing that diagnosis and did so because they said, well, I knew that they were pursuing other means to try to get that, would that not get you there? Your Honor, I take your point, but I think that that analogy is not this case. Because I think in this case, a parent, Kimmel Goodman, is not just saying, I know you're pursuing it. She's saying, I know you're well-adjusted. You have no acute mental health concerns at the time. I know you're seeing APR and Rachel. For a period of time, she knows that she's receiving hormone therapy. She is treating her with Prozac. So this idea that I know that this is ineffective or something, that's just not borne out the record. We have to look at the record in this posture, right? We have to look at the record in the most friendly way to the other side, right? In terms of, and so we have some isolated, as the district court noted, sort of isolated documentation of she seems to be well-adjusted today. We also have a history in which she engaged in a brutal act of self-mutilation. Yes. And repeatedly complained to her providers, feeling that same sense of desperation and need for treatment. Are we to ignore all of that because of the notes that say she was well-adjusted? No, I think actually quite the opposite. The brutal act of self-mutilation happened before these defendants got involved. And after they got involved and treatment began, there were no acts of self-mutilation. And in this way, this case is not unusual in the realm of gender dysphoria. There were acts of self-mutilation, I believe, in Koselec, in Campbell. There were threats of suicide in Lamb. I mean, that's not unusual in these situations. But I would point out, again, the plaintiff, this is admitted, Joint Appendix 122. After she began hormone therapy, providers know the plaintiff reported her mood was really good, the best ever. Plaintiff reported the following benefits of hormone therapy. Improved self-esteem, reduced muscle mass, increased breast growth, the slowing of her male pattern baldness, a dramatic reduction in erections and sex drive. So the point is, the treatment was effective. It just didn't completely ameliorate the issue. It didn't cure it. And that's why this case is also different than Hathaway. Hathaway is a case where not only is a surgeon or a doctor identified, like in the ether, there's a person who's saying, I can fix this. I can cure it. If there was somebody saying, I can cure Ms. Clark. I can give her a pill. Or I can give her a surgery. I can give her something that's going to totally resolve this. And these defendants said, no, I'm not doing that. That's a different story. That might be deliberate indifference. But that's just not this case. And when you look at the actual cases from the circuits and from the Supreme Court, again, I have to disagree with my friend's position that it's the medical community that drives this. Because the medical community, particularly and frankly in this condition, there's disputes about this. That's one of the reasons why COSELECT came out the way it is. One of the reasons why Gibson came out the way it is. What is important for notice for purpose of qualified immunity are decisions, binding decisions from the Supreme Court and at the very least this circuit. And when you look at this case, if you do what the Supreme Court did in Taylor, you formulate the right with regard to the risk. And then you talk about, have we ever talked about this before? No, we have not. Are there any circuit court cases from the circuit in question that address this? No. The best we can do is identify the risk at issue, which was suicide. The paradigmic risk, mental health risk, in prison. And they say to the extent circuit court cases from other circuits matter, those cut against depriving the person of qualified immunity. That's the exact same situation we have here. All right. Well, thank you both. Very well argued and certainly an interesting and important case. We will reserve decision.